Filed 2/24/14  P. v. Jimenez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>CELESTINO JIMENEZ,<br><br>　　　Defendant and Appellant. | H038857<br>(Monterey County<br>Super. Ct. No. SS120595) |

## I.　　INTRODUCTION

Defendant Celestino Jimenez appeals after a jury convicted him of making a criminal threat (Pen. Code, § 422[1]) and being in contempt of court for violating a protective order (§ 166, subd. (c)(1).  The jury also found true an allegation that defendant personally used a deadly or dangerous weapon while making the threat (§ 12022, subd. (b)).  The trial court suspended imposition of sentence and placed defendant on probation for three years.

On appeal, defendant contends the trial court erred by:  (1) granting the prosecution's motion to consolidate two cases; (2) interfering with and criticizing trial counsel during trial; (3) failing to instruct on the lesser included offense of attempted

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

criminal threats; (4) denying defendant's motion for a new trial, which was based on newly discovered evidence; and (5) imposing certain probation conditions.

We will modify certain probation conditions and affirm the judgment as modified.

## II.    BACKGROUND

The facts of this case come from two incidents:  (1) an incident on March 31, 2012, which led to charges of assault, threats, and destruction of a wireless communication device; and (2) an incident on May 27, 2012, which led to a charge of contempt based on violation of a protective order.

### A.    *Incident on March 31, 2012*

On March 31, 2012, defendant was living at Del Monte Farms in Castroville, in a home he shared with his girlfriend, Maria Rodriguez Contreras, and their two-year-old son.  Also residing at the home were Merilu Perez, her husband Jose Salvadore Rodriguez Contreras (Maria's brother), and their two children.[2]  According to Maria, her mother also lived at the house.

Maria was 23 years old at the time.  She was unemployed because she had a heart condition.  Defendant had lived with her for four years and provided her with financial assistance.

At about 8:15 p.m., Maria and defendant were in the kitchen.  Merilu was in the bedroom, which was near the kitchen, and Jose was outside.  Merilu heard yelling from the kitchen and heard Maria call out for Jose.  Merilu came out of her bedroom and saw defendant with a pocket knife in his hand.  Jose came into the kitchen eight to ten seconds later.  Jose told defendant to let go of the knife, but defendant refused, so Jose took the knife away from defendant and brought defendant outside.  Merilu returned to her bedroom to call the police.

---

[2] Because Maria Rodriguez Contreras and Jose Rodriguez Contreras share the same last name, we will refer to them by their first names.  Likewise, because Merilu Perez shares the same last name as one of the deputies, we will refer to her by first name.

2

Monterey County Sheriff's Deputies Jesse Grant and Jorge Perez responded to the dispatch call. A third officer also responded, because Merilu told the dispatcher that defendant was trying to stab her husband.

The officers interviewed Maria, who said she had been in the kitchen when defendant entered and accused her of being unfaithful. Defendant had opened his pocket knife and brandished it at Maria, causing her to become "fearful for her safety." Defendant threatened to kill her and take their son away. He advanced towards her in a threatening manner. She called for Jose. She was "in fear for her life." Defendant had been 10 to 12 feet away from her initially, but he was two to three feet away when Jose came in and took the knife away from him. During the incident, defendant had picked up her cell phone from the kitchen table and put it in his pocket in order to prevent her from calling 9-1-1.

Maria told the officers that defendant had previously been violent with her. The most recent incident had been one month earlier. Maria said that she wanted to press charges. According to one officer, Maria was crying throughout the entire 20 to 25-minute interview and was "very upset." According to another officer, Maria was initially "upset and frightened" but calmed down as the interview progressed.

Jose told the officers that after he heard Maria cry for help, he entered the kitchen and saw defendant advancing towards her with a knife. Jose grabbed the knife from defendant, who engaged him in a fist fight. After he took defendant outside, defendant tried to get back into the house.

Merilu told the officers she had called 9-1-1 because she saw Jose and defendant tussling over the knife and she believed defendant was trying to stab Jose.

The officers found a knife on the kitchen counter. They did not find Maria's cell phone; defendant did not have it on his person. None of the witnesses mentioned that defendant had been using the knife to open beer bottles or slice lemons, and the officers did not notice any beer bottles or lemons in the kitchen.

## B. Charges and Protective Order

At defendant's arraignment on April 3, 2012, the trial court set bail and issued a criminal protective order. The criminal protective order required defendant to have no contact with Maria and to stay 100 yards away from her.

By the next hearing on April 10, 2012, defendant had been released on bail. At a hearing on May 1, 2012, Maria requested the criminal protective order be modified or terminated, but the court declined to do so. However, at the end of the preliminary hearing on May 17, 2012, the court modified the criminal protective order to permit "peaceful third party contact for visitation." The trial court specified, "That means contact through a third party to arrange visitation with respect to the child." When defendant attempted to clarify the order, the trial court further specified, "Third party meaning he can contact a third party that they designate in order for that third party to contact Maria, who will then set up any visitation with respect to the child, and that third party will make the arrangements for visitation, but she won't be part of it. That's what that means, third party contact." When trial counsel asked about peaceful contact with Maria herself, the trial court stated that it would reconsider that issue at a later date and time.

On May 22, 2012, the District Attorney filed an information in case No. SS120595A, charging defendant with assault with a deadly weapon (count 1; § 245, subd. (a)), making a criminal threat (count 2; § 422), and interfering with a wireless communications device (count 3; § 591.5). The information alleged that defendant personally used a deadly or dangerous weapon while making the threat (§ 12022, subd. (b)).

## C. Incident on May 27, 2012

On May 27, 2012, Deputy Perez decided to perform a welfare check on Maria at her residence. He had been in court for the preliminary hearing on May 17, 2012 and had noticed that Maria seemed scared.

4

Deputy Perez performed the welfare check at 10:11 p.m. As he approached the front door to the house, Deputy Perez walked past a window. Inside, he saw defendant in the kitchen. He knocked on the door, obtained consent to enter, walked inside, and saw Maria pushing defendant behind a bedroom door. Defendant, who was wearing pajamas and slippers, claimed he had gone to the house to visit his son. Maria said that defendant had been at the house since noon.

### D. Contempt Charge and Consolidation

Following the incident on May 27, 2012, defendant was charged with being in contempt of court for violating a protective order (§ 166, subd. (c)(1)) in case No. MS304947A. On June 18, 2012, the prosecution filed a motion to consolidate that case with case No. SS120595A. Defendant opposed the motion, but it was granted at a hearing on June 22, 2012.

On June 25, 2012, the District Attorney filed an amended information in case No. SS120595A, which included the three original charges and added the contempt charge as count 4.

### E. Trial Testimony

#### 1. Percipient Witnesses

At trial, Merilu, Jose, and Maria all gave testimony that differed from their initial statements about the March 31, 2012 incident.

Merilu testified that defendant "wasn't saying anything" when she looked in the kitchen and saw him with the knife. She denied telling the 9-1-1 dispatcher that defendant had attempted to stab Jose. She claimed she had not known defendant to be an aggressive person.

Jose testified that when he came into the kitchen, defendant was not doing anything except holding the knife at his sides. Defendant was about 10 feet away from Maria. Jose had not previously seen defendant be violent with Maria.

5

Maria testified that on March 31, 2012, defendant was drinking with another man, Francisco Sanchez. Sanchez got too close to Maria at one point, which upset defendant. Defendant had been using the pocket knife to open beer bottles and slice lemons. She acknowledged she had been "scared because of the knife," but she denied telling the police that defendant had threatened to kill her and take their child. She denied telling police that defendant had done anything with her phone or that he had had been violent to her in the past.

Maria further testified that on April 1, 2012, the day after the incident, she called Deputy Grant to say she did not want to press charges. She subsequently came to court and asked that the restraining order be lifted because her son was asking for defendant. The judge said that defendant "could see our son with a third person involved." Her understanding was that a third party just had to be present. She denied that she was trying to hide defendant when Deputy Perez came over on May 27, 2012. She acknowledged that defendant had not just visited with their son that day; he had also eaten and showered at the house.

### 2. Domestic Violence Expert

Rosemary Soto testified as an expert in "intimate partner battering." She described some "common characteristics" among victims of domestic violence and explained that domestic violence "boils down" to the abuser's desire for "power and control." Soto confirmed that victims of domestic violence often minimize the abuser's behavior and provide excuses, such as " 'He hit me because he was drunk.' " Victims of domestic violence often "completely recant," especially if the abuser has been prohibited from contact with the victim and they share children. It is also common for victims of domestic violence to reunite with the abuser.

### 3. Defendant

Defendant testified, admitting that he had a drinking problem and that Maria did not want him to drink. He also testified that he does not speak English. He denied that

he had ever been physically violent with Maria. Their only physical confrontation had occurred one time when she pushed him.

Regarding the incident on March 31, 2012, defendant testified that he had consumed 14 or 15 beers. He and Maria had argued about his drinking and about the other man who had been at the house. The incident began when Maria told him to go outside. Instead of complying, defendant opened another beer. He used the blade of his pocket knife to open the bottle and to cut a lemon, which he put into the beer. At that point, Maria called Jose, who came in and told defendant to give him the knife. Defendant denied making any threats or taking Maria's phone. Defendant claimed there was another person in the kitchen during the incident, but he did not identify the person.

Defendant explained that he had received the criminal protective order at his first court hearing. The order was in English, but he knew it prohibited him from seeing Maria or their son. When the order was modified on May 17, 2012, he did not receive anything in writing. He understood that he was allowed to "go and see the child and have contact with [Maria]." He believed he "could always go see [his son] whenever there would be a third person present." On May 27, 2012, he asked Maria's mother for permission to go see his son; her mother was present during the entire visit.

### F. *Verdicts, Motion for New Trial, and Sentencing*

The jury found defendant not guilty of assault with a deadly weapon (count 1; § 245, subd. (a)(1)) and not guilty of interfering with a wireless communications device (count 3; § 591.5). Defendant was convicted of making a criminal threat (count 2; § 422) and being in contempt of court for violating a protective order (count 4; § 166, subd. (c)(1)). The jury found true the allegation that defendant personally used a deadly or dangerous weapon while making the threat (§ 12022, subd. (b)).

Defendant filed a motion for a new trial on August 31, 2012, based on newly discovered evidence: an eyewitness who had not heard defendant make the threat to Maria.

7

On September 20, 2012, the trial court denied the motion for new trial and held a sentencing hearing. The trial court suspended imposition of sentence and placed defendant on probation for three years.

### III.    DISCUSSION

#### A.    *Consolidation*

Defendant contends the trial court erred by granting the prosecution's motion to consolidate the assault/threat case with the contempt case.

#### 1.    Proceedings Below

In the motion to consolidate, the prosecution argued that the two cases were "significantly connected"; that they involved the same victim, arresting officer, and location; and that the evidence and issues would overlap. In his opposition, defendant argued that the assault/threat case was "much more serious, and violent" than the contempt case, that the connection between the two cases was insufficient to warrant consolidation, and that the evidence would not be cross-admissible in separate trials. At the hearing on the motion, the parties made similar arguments.

The trial court granted the motion to consolidate. The court found that the two cases were "related" and "connected in their commission" because "[w]ithout the assault case there wouldn't have been a criminal protective order to violate." The court further found that both cases "have the same witnesses" and thus that it would be an efficient use of court time to try them together. Additionally, the court found there would not be "a spill over" effect, as the offenses were "very similar in severity" because "they both relate to domestic violence."

#### 2.    Legal Principles

Section 954 states in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if

8

two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

"[T]he requirement of section 954 that offenses be 'connected together in their commission' may be satisfied even though 'the offenses charged "do not relate to the same transaction and were committed at different times and places . . . against different victims." ' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218 (*Alcala*), italics omitted.) "[E]vidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (§ 954.1.)

"The purpose underlying this statute is clear: joint trial 'ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 772.) " 'The law prefers consolidation of charges. [Citation.]' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 574.)

Once the statutory requirements for joinder have been met, a defendant can establish that the trial court erred in allowing a joint trial "only by making a 'clear showing of prejudice to establish that the trial court abused its discretion in denying . . . [a] defendant's severance motion.' [Citation.]" (*Alcala, supra,* 43 Cal.4th at p. 1220, italics omitted.) "The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 161 (*Mendoza*).)

9

### 3. Analysis

Defendant contends that the assault/threat case and the contempt case were neither "connected together in their commission" nor "different offenses of the same class of crimes or offenses" as required for consolidation under section 954. He criticizes the trial court for reasoning that "[w]ithout the assault case there wouldn't have been a criminal protective order to violate."

In asserting that the trial court's rationale was erroneous, defendant relies on *People v. Madden* (1988) 206 Cal.App.3d Supp. 14 (*Madden*). In *Madden,* the defendant was originally charged with unlawful possession of a hypodermic syringe. After he failed to appear in court for a hearing on that charge, the trial court permitted the prosecution to add a count of failing to appear in court as promised. (*Id.* at pp. 16-17.) The appellate department of the superior court held that the trial court erred because the two crimes were neither connected in their commission nor of the same class. (*Id.* at p. 17.) The court reasoned, "[T]he two counts share neither instrumentality, victim, modus operandi, nor any other common element of substantial importance. The only connection between failure to appear and possession of a hypodermic syringe is that, had appellant not been charged with the possession offense, there would not have been a trial date for appellant to miss. This, of course, is not enough. If it were, the nature of the underlying charge would be irrelevant and the legislative intent behind Penal Code section 954 would be vitiated." (*Id.* at p. 18.)

Unlike in *Madden,* we cannot say that the "only connection" between the charges here is that, but for the assault/threats charges, there would not have been a court order for defendant to violate. (*Madden, supra,* 206 Cal.App.3d Supp. at p. 18.) Here, the two incidents were factually connected, and the underlying circumstances of each incident were relevant to the other incident. The evidence in the contempt case, which involved Maria's apparent reconciliation with defendant, was relevant to the credibility of her testimony in the assault/threat case. Similarly, the evidence in the assault/threat case,

which showed that Maria had recanted and decided not to press charges, was relevant to the determination of whether defendant committed a "willful and knowing violation" of the protective order (§ 166, subd. (c)(1)). Finally, Maria and Deputy Perez were the primary witnesses to both incidents. Thus, as the trial court found, the two cases were "connected together in their commission" (§ 954) and a joint trial would conserve judicial resources by ensuring there was no need to recall the same witnesses in two separate proceedings.

Defendant also fails to show prejudice. (See *Alcala, supra,* 43 Cal.4th at p. 1220.) Because the underlying circumstances of each case were relevant to the issues in the other case, much of the evidence would have been cross-admissible in separate trials. (See *Mendoza, supra,* 24 Cal.4th at p. 161.) None of the charges were "likely to unusually inflame the jury against the defendant," as none involved infliction of injury or particularly offensive behavior. (See *ibid.*) Neither case was particularly weak, and thus this is not a situation in which "a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges." (See *ibid.*) None of the charges were capital offenses. (*Ibid.*) Finally, and significantly, the jury acquitted defendant of two counts, reflecting its ability to carefully consider the evidence as to each count.

In sum, the trial court did not abuse its discretion by permitting the prosecution to consolidate the two cases.

### B.     *Judicial Misconduct*

Defendant contends the trial court committed misconduct by interfering with and criticizing trial counsel during trial. His claim is based on a number of incidents that occurred during jury voir dire, opening statements, and closing arguments.

11

### 1. Jury Voir Dire

Defendant points to four instances during jury voir dire in which the trial court curtailed trial counsel's line of questioning either sua sponte or by sustaining an objection by the prosecutor.[3]

The first voir dire incident occurred during a question to Prospective Juror No. 2. Trial counsel asked whether the prospective juror would vote to convict defendant based on defendant's intoxication, even if there was no evidence he was guilty of a charged crime. The trial court interjected, "So this is inappropriate to ask jurors to prejudge the case." Trial counsel apologized and rephrased the question, which the prospective juror answered.

The second voir dire incident occurred when trial counsel asked whether any prospective juror would find defendant not guilty if he or she felt that defendant had "a valid explanation" for violating a court order. The trial court stated, "So that's not an appropriate question. It's asking the jury to prejudge the case. That's not allowed." Trial counsel then rephrased the question to ask whether the prospective jurors would be able to find defendant not guilty if he "did the act charged" but "did not act with the required intent." The trial court reiterated that trial counsel was "asking for the jury to prejudge" and asked trial counsel to "move on to something that's not asking them to prejudge the facts of this case." The trial court also reminded trial counsel that voir dire was supposed to be related to "challenges [for] cause."

The third voir dire incident occurred when trial counsel was asking the prospective jurors whether any of them would believe a police officer who contradicted the testimony

---

[3] Prior to the four voir dire incidents that defendant complains about, the trial court admonished trial counsel twice: first, when trial counsel spoke to a prospective juror in a language other than English; and second, when trial counsel asked Prospective Juror No. 21, who was a criminal defense attorney, whether the prospective juror's clients sometimes did not understand interpreters. Defendant does not contend either of these incidents was improper.

of another witness.  The prosecutor objected, arguing that trial counsel was "[p]re-trying the facts of the case."  The trial court responded to the objection by stating, "I think the question can be asked in a different way.  As phrased, it is inappropriate.  The question is would you judge the credibility of all the witnesses by the same standards?"  Trial counsel followed up by again asking whether any jurors "feel that a law enforcement witness by definition is automatically more credible than a civilian witness?"  This time, when the prosecutor objected, the trial court overruled the objection, finding the question "appropriate."

The fourth voir dire incident occurred when trial counsel was questioning Prospective Juror No. 38, who had worked at a women's shelter and whose friend had been killed in a "domestic violence case."  Trial counsel asked whether Prospective Juror No. 38 could set aside her personal feelings and vote not guilty if the evidence showed that defendant "had been drinking, was acting [like] a jerk," and had engaged in conduct similar to the type of conduct she knew about from her prior experiences, even if the prosecution had not met the burden of proof.  The trial court sustained the prosecutor's objection to the question.  Trial counsel rephrased the question and Prospective Juror No. 38 answered it.

### 2. Opening Statement

Defendant identifies six instances in which the trial court interrupted trial counsel's opening statement.

Trial counsel began his opening statement by telling the jury that the evidence it would hear "is going to be nothing like what [the prosecutor] just offered to you."  He claimed that the prosecution's witnesses did not know defendant and would say "negative things" about him:  that he "is a women beater; that he is a domestic batterer; that he is violent; that he is a mean drunk."  He continued, "But the reality is that nothing could be further from the truth.  They're not going to have a single person -- .''

13

The trial court interrupted trial counsel, saying, "[Y]ou need to limit your comments to what you expect your evidence will show."

Trial counsel continued his opening statement, describing how Maria and her family members would say that defendant had never been physically abusive to Maria and how the incident merely involved an argument over defendant's drinking. Trial counsel stated that Maria had tried to have the charges dropped and had insisted there was no domestic violence, but that the prosecution "insisted on proceeding forward with this domestic violence theory." Trial counsel stated that even after the preliminary hearing, the prosecution "still insists on going forward with this domestic violence theory" and had decided "[a]t the last moment," to use a domestic violence expert.

The trial court interrupted again, instructing trial counsel to "confine your comments to what you expect the evidence to show in this matter and nothing further."

Trial counsel next stated, "Their alleged expert, Ms. Soto, will tell you that sometime last week she agreed to testify as an expert in this case." The prosecutor objected, and the trial court agreed, "It is improper." The trial court told trial counsel, "If you can't confine your comments to admissible evidence, you'll be done with your opening statement."

Trial counsel continued to discuss Soto, noting that she "has never actually done any assessment on anybody in this case" and had "[n]ever talked to anybody in this case" but would simply "assume[]." The prosecutor objected again. The trial court ruled, "It is improper," and asked, "Are you done with your opening statement?" When trial counsel responded, "No, Your Honor," the trial court told him, "You better wrap it up with what you think your evidence is going to present in this matter."

When trial counsel told the jury that Soto would be "testifying in generalities," the prosecutor objected, but the trial court overruled the objection. However, when trial counsel told the jury that it would be "up to you to determine how qualified Ms. Soto is to offer the testimony that she is offering," the trial court stated, "That is improper."

14

Trial counsel then clarified that Soto's qualifications would be discussed later and that it would be the jury's job to "determine what weight to give her."

Trial counsel then told the jury that it would hear about defendant's actions following the arrival of police officers. He stated that defendant was injured, cooperative, and did not try to flee. He also stated that defendant "continued to come to every court appearance" even though he was "free on bail." When the prosecutor objected, the trial court took a recess and asked to see "both counsel in my chambers right now."

After a break, the trial court informed trial counsel on the record that he could "continue [his opening statement] pursuant to the appropriate standards." Trial counsel then discussed the evidence regarding the contempt charge without interruption.

### 3. Mistrial Motion and Admonition

The day after opening statements, trial counsel moved for a mistrial. He explained, "My concern was yesterday the jury was exposed to the Court telling me to stop my argument and go to chambers to speak with you. We were gone for some time. And when we came back, there was no admonition to the jury. [¶] There were also comments made to the extent of that I had to proceed with appropriate argument. And I'm worried about the effect that may have had on the jurors."

Trial counsel also apologized to the trial court for his "behavior," noting that "Your Honor was upset with me yesterday. You admonished me harshly in chambers about statements during opening statement. I know Your Honor has raised your voice at me, pointed a finger. I know you were upset." Trial counsel then requested a mistrial "based on what happened, the exposure to the jury and what effect, if any, that may have on you in conducting this proceeding further."[4]

---

[4] In the trial court, defendant also raised a second ground for the mistrial motion. He argued that he was improperly prohibited from communicating with trial counsel during opening argument. Defendant does not raise this issue on appeal.

15

The trial court responded by noting that trial counsel had referred to his "opening argument" and that he appeared to be confused about "what an opening statement is to be." The trial court explained, "An opening statement, as the Court tried to point out to you numerous times yesterday . . . , is an opportunity for the attorneys to provide information about what their evidence will show. It is not an opportunity for attorneys to argue to the jury. [¶] Unfortunately, when you started out yesterday, you started out with argument and the Court interrupted you and asked you to limit your comments to what you expected the evidence would show."

The trial court explained that it had taken trial counsel back into chambers to instruct him that his "comments would be limited to an opening statement." The trial court found that nothing that had occurred "would impact the jury," particularly since its "more serious comments . . . were done in chambers outside the presence of the jury." The court denied the mistrial motion.

The trial court later made the following statement to the jury: "I think during jury selection the other day I mentioned things happen during a trial that you just never know what's going to come out. There was an exchange yesterday between Court and counsel. I just want to read you an admonition to let you know it's important that you not take anything that I say or do during the trial as an indication of what I think about the facts, the witnesses or the attorneys and what your verdict should be in this matter. So you're to disregard any exchange that I have with the attorneys if that occurs."[5]

---

[5] In addition to the admonition quoted above, the trial court instructed the jury both at the beginning and end of trial, "Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be." (See CALCRIM Nos. 101, 3550.) The trial court also told the jury that it would "rule on the objections according to the law" and that the jury should not "guess . . . why I ruled as I did." (See CALCRIM Nos. 104, 222.)

### 4.    Closing Argument

During her argument in rebuttal, the prosecutor asked the jury to consider that the deputies were "simply doing their job" and had no "motive to be untruthful." Trial counsel, who had already objected three times during the rebuttal, objected "to the officer nodding during the argument." The trial court responded, "You know, [trial counsel], I think that you need to lighten up a bit. Your objection is overruled. The officer is -- it's appropriate for him to be here. And your comments are not appreciated." The trial court then instructed the jury to "disregard the Court's statements to counsel" and instructed the prosecutor to proceed.

### 5.    Legal Principles and Analysis

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.)

However, "[a] 'trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution.' [Citations.] Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.] When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.' [Citation.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233 (*Sturm*).)

In *Sturm*, a trial judge committed misconduct by engaging in a pattern of disparaging defense counsel and belittling defense witnesses, conveying the impression that he favored the prosecution. (*Sturm, supra,* 37 Cal.4th at p. 1238.) Among other

17

things, the judge stated that federal grants received by a defense pharmacology expert had " 'contributed to the federal deficit' "; told a defense psychologist that she used too many adjectives and adverbs and embellished her answers, and suggested her testimony was inconsequential; disparaged defense counsel in front of the jury, stating, inter alia, that he was attempting to elicit improper evidence; and interposed its own objections to defense counsel's questions over 30 times.  (*Id.* at pp. 1233-1237, 1239-1241.)  While "no one instance" required reversal, the cumulative effect of the misconduct did.  (*Id.* at p. 1243.)

Defendant contends that the trial court here committed misconduct like that in *Sturm*.  He argues:  (1) the inquiries he made during voir dire were all proper because they were " 'in aid of the exercise of challenges for cause' " (Code Civ. Proc., § 223); (2) there was nothing improper in his opening statement; and (3) he made a valid objection during the prosecutor's rebuttal argument. Defendant contends the trial court interfered with trial counsel's effective representation and that collectively, the instances of judicial misconduct were prejudicial.

We first address whether the trial court appropriately limited trial counsel's voir dire.  As noted above, the trial court precluded trial counsel from asking (1) whether two prospective jurors would convict defendant based on his intoxication, even if there was no evidence he had committed a crime; (2) whether a prospective juror would convict defendant if he had "a valid explanation" for violating a court order or if he "did the act charged" but "did not act with the required intent"; and (3) whether the prospective jurors would believe a police officer who contradicted the testimony of another witness.

Regarding jury voir dire, "it is not 'a function of the examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' [Citation.]  Therefore, a question may be excluded if it appears to be intended solely to accomplish such improper purpose." (*People v. Williams* (1981)

18

29 Cal.3d 392, 408, fn. omitted (*Williams*), superseded by statute as stated in *People v. Noguera* (1992) 4 Cal.4th 599, 646.)

Here, the incidents that defendant complains about involved trial counsel questioning prospective jurors about how they would vote, or what witnesses they would believe, under a particular factual scenario. Trial counsel's questions appear to have been aimed at educating the jurors about the facts of the case, arguing the case, and encouraging the jurors to commit to certain positions. It was therefore within the trial court's discretion to curtail his voir dire in those four instances. (See *Williams, supra,* 29 Cal.3d at p. 408.)

We next address whether the trial court appropriately interrupted trial counsel's opening statement. As noted above, the trial court found that trial counsel was not limiting his comments to what he expected the evidence to show.

Section 1093 specifies that "opening statement" is made prior to the presentation of evidence, and that it is distinct from "argument," which occurs "[w]hen the evidence is concluded." (§ 1093, subds. (b), (e).) "The purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present. . . ." (*People v. Millwee* (1998) 18 Cal.4th 96, 137 (*Millwee*).)

In his opening statement, trial counsel did not simply "inform the jury of the evidence the prosecution intends to present. . . ." (*Millwee, supra,* 18 Cal.4th at p. 137.) Rather, he argued the case to the jury. Trial counsel argued that despite the expected testimony from the prosecution's witnesses, "nothing could be further from the truth." He argued that the prosecution was "insist[ing] on going forward with this domestic violence theory" and had only obtained a domestic violence expert "[a]t the last moment." Trial counsel argued that the jury should find Soto was unqualified as an expert in domestic violence, and he suggested that Soto's testimony should not be given any weight because she would be making assumptions and "testifying in generalities." In addition to arguing the case, trial counsel also referred to evidence that was unlikely to be

19

admitted at trial: the fact that defendant had come to all of his court appearances despite being out on bail.

The trial court did not err by curtailing trial counsel's opening statement when he ventured into the area of argument or facts that would not be admitted at trial. It is notable that trial counsel essentially admitted he believed he was permitted to argue during opening statement: he referred to opening statement as "argument" when asking for a mistrial. It was not improper for the trial court to ensure that trial counsel presented "opening statement" (§ 1093, subd. (b)) rather than "argument" (*id.,* subd. (e)).

Finally, we consider whether the trial court appropriately overruled trial counsel's objection during the prosecutor's argument in rebuttal and told trial counsel to "lighten up" when Deputy Grant apparently nodded in agreement with the prosecutor. We agree with defendant that if Deputy Grant had been nodding in agreement with the prosecutor, the trial court should have sustained the objection and admonished the jury to disregard the behavior. (Cf. *People v. Tate* (2010) 49 Cal.4th 635, 693 [trial court properly admonished jury to disregard the prosecutor's "reactions, expressions, and gestures" during defendant's testimony].) Defendant does not challenge the trial court's rulings on his three prior objections, all of which were overruled, and it appears the trial court's "lighten up" comment was intended to discourage trial counsel from continuing to make frequent non-meritorious objections to the prosecutor's argument in rebuttal. Although this particular objection may have been well-taken, the trial court's ruling and comments could not have prejudiced defendant, particularly since the trial court immediately admonished the jury to "disregard the Court's statements to counsel."

Having reviewed the entire record, we believe defendant received a fair trial. As recounted above, each of the complained-about incidents were fair rulings, particularly when considered in light of the trial court's duty to control the trial proceedings. (See § 1044.) The only exception was the incident during argument in rebuttal, when the trial court should have sustained defendant's objection, admonished the jury to disregard any

nodding by Deputy Grant, and refrained from making the "lighten up" comment. As explained above, this incident was not prejudicial. Importantly, the jury acquitted defendant of two of the four charges. This strongly indicates that despite any of the instances of alleged judicial misconduct, trial counsel was able to perform as an effective advocate. The verdicts further indicate that the jury carefully and conscientiously performed its duties; it was not improperly influenced by any of the trial court's comments or rulings. In sum, we find no judicial misconduct warranting reversal.

### C. Failure to Instruct on Lesser Included Offense

Defendant contends the trial court erred by failing to instruct the jury, sua sponte, on attempted criminal threat (§§ 664/422) as a lesser included offense of criminal threat (§ 422; count 2). Defendant contends an instruction on attempted criminal threat was required here because there was substantial evidence that Maria was not "reasonably . . . in sustained fear." (§ 422.)

#### 1. Legal Principles

"A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right. To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present. [Citations.] [¶] But this does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses. Rather, . . . ' "such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of

21

reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed." ' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 215.)

"In order to prove a violation of section 422,[6] the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo* ).) The term *sustained fear* "means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).)

Attempted criminal threat (§§ 664/422) is a lesser included offense of criminal threat. (See *Toledo, supra,* 26 Cal.4th at p. 230; *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 607.) "[A] defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that

---

[6] Section 422 states: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ."

he or she is putting a plan into action." (*Toledo, supra,* at p. 230.)  For instance, "if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat . . . would occur.  Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Id.* at p. 231, italics omitted.)

### 2.    Analysis

As noted above, defendant contends an instruction on attempted criminal threat was warranted because there was substantial evidence that Maria was not "reasonably . . . in sustained fear." (§ 422.)  Defendant argues that a jury could have found that Maria's fear "did not exist beyond the moments of the encounter." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140 (*Ricky T.*).)  He points out that the incident was brief, in that Jose entered the kitchen to disarm defendant about eight to ten seconds after Maria called for him.  He also asserts that although Deputy Grant testified that Maria was crying throughout her 20 to 25-minute interview, the jury could have concluded that she was merely upset rather than still in fear.  He points out that according to Deputy Perez, Maria was initially "upset and frightened" but calmed down as the interview progressed.

Defendant further argues that the jury could have found that under the circumstances, it would not have been reasonable for Maria's fear to have continued after defendant was disarmed.[7]

---

[7] In *People v. Chandler* (2012) 211 Cal.App.4th 114, review granted Feb. 13, 2013, S207542, the California Supreme Court is considering whether a defendant may be

23

The Attorney General contends there is no substantial evidence that Maria's fear was anything other than "sustained" (§ 422), contrasting the evidence in this case with that in *Ricky T.*

In *Ricky T., supra,* 87 Cal.App.4th 1132, a high school student left class to use the restroom and, upon returning, "found the classroom door locked and pounded on it." (*Id.* at p. 1135.) When the teacher opened the door, the door struck the student, who became angry, cursed the teacher and told the teacher, " 'I'm going to get you.' " (*Ibid.*) The teacher "felt threatened and sent [the student] to the school office." (*Ibid.*) The appellate court found the evidence insufficient to sustain a finding that the student had made a criminal threat for a number of reasons, including the lack of substantial evidence that the teacher "felt fear beyond the time of the angry utterances." (*Id.* at p. 1140.) "Whatever emotion—fear, intimidation, or apprehension—[the teacher] felt during the moment of the verbal encounter, there was nothing to indicate that the fear was more than fleeting or transitory." (*Ibid.*)

In *People v. Fierro* (2010) 180 Cal.App.4th 1342 (*Fierro*), the court distinguished *Ricky T.* and found substantial evidence of sustained fear. *Fierro* involved an altercation at a gas station. During the incident, the defendant lifted his shirt, displaying a weapon tucked into his waistband, and threatened to kill the victim. The victim testified that he was in fear for his life, but he was able to drive away shortly after the threat. The victim called 9-1-1 within 15 minutes of the incident and reported that "he was 'scared shitless.' " (*Id.* at p. 1346.) On appeal, the defendant argued that there was insufficient evidence that the victim had been in sustained fear, pointing to evidence that the incident itself had lasted only about a minute. (*Id.* at pp. 1348-1349 & fn. 5.) The *Fierro* court rejected this claim, explaining that even if the victim had only been in fear during the incident itself, "the minute during which [the victim] heard the threat and saw appellant's

found guilty of attempted criminal threat where it would not be reasonable for the victim to be in sustained fear. (Cf. *People v. Jackson* (2009) 178 Cal.App.4th 590, 597-598.)

24

weapon qualifies as 'sustained' under the statute. When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' [Citation.]" (*Id.* at p. 1349.)

In this case, defendant does not argue that the evidence was insufficient to support a finding that Maria was in sustained fear during the incident. Rather, he claims that the evidence would also have supported a finding that she was *not* in sustained fear. We disagree. The evidence showed that defendant threatened to kill Maria while holding a knife. She was so scared that she called for help. Although it took Jose only eight to ten seconds to respond, and he was able to quickly disarm defendant, defendant continued to fight Jose and try to get back into the house. When the officers arrived, Maria was still "frightened," at least initially, saying that she had been "in fear for her life." Even if Maria's fear only lasted during the incident itself, the time during which she heard the death threat and saw defendant brandishing the weapon qualified as sustained. (See *Fierro, supra,* 180 Cal.App.4th at p. 1349.) There was no evidence suggesting Maria was not frightened by defendant's threat, or that her fear was only "momentary, fleeting, or transitory." (*Allen, supra,* 33 Cal.App.4th at p. 1156.) Likewise, there was no evidence suggesting that Maria's sustained fear was not reasonable.

Even assuming the trial court should have instructed the jury on the lesser included offense of attempted criminal threat, any error was harmless. An error in failing to instruct on a lesser included offense does not warrant reversal unless an examination of the entire cause, including the evidence, discloses that "it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*); see *People v. Watson* (1956) 46 Cal.2d 818, 836.) "There is a reasonable probability of a more favorable result . . . when there exists 'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result.' [Citation.]" (*People v. Mower* (2002) 28 Cal.4th 457, 484.) In undertaking this inquiry, "an appellate court may consider, among other things, whether the evidence supporting the existing

judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman, supra,* at p. 177.)

In this case, defendant denied making the threat at all and he did not contest the issue of Maria's fear. The jury found, however, that defendant made the threat and that in doing so, he used a deadly or dangerous weapon (§ 12022, subd. (b)). The evidence presented at trial to support the sustained fear finding was very strong, whereas there was little to no evidence that Maria was not in reasonable and sustained fear. (See *Breverman, supra,* 19 Cal.4th at p. 177.) The threat here was specific: defendant said he would kill Maria. (Compare *Ricky T., supra,* 87 Cal.App.4th at p. 1140.) After the incident, Maria told the officers she was "in fear for her life," and she had been scared enough to call out for help during the incident itself. Defendant had brandished a knife when making the threat, and he was at most 12 feet away from Maria when he did so. Merilu was concerned enough about defendant's violent behavior that she called 9-1-1. The incident did not end when defendant was disarmed: defendant struggled with Jose after Jose took the knife away and brought defendant outside. This evidence overwhelmingly showed that Maria was in reasonable and sustained fear. Thus, "there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman, supra,* at p. 177.)

### D.   *Motion for a New Trial*

Defendant contends the trial court erred by denying his motion for a new trial, which was brought on the basis of newly discovered evidence: the fact that Ebaristo Gutierrez had been present in the house during the incident but had not heard defendant make any threat.

### 1.   Proceedings Below

In his motion for a new trial, defendant asserted that "on August 27, 2012, the defense for the first time learned that there may have been another witness who [had]

26

heard the argument" between him and Maria. A defense investigator subsequently contacted the person, Gutierrez, who confirmed that he had been present in the house during the March 31, 2012 incident. Gutierrez told the investigator that he never heard defendant threaten Maria, and that because he was so close to the kitchen, he would have heard such a threat if it had been made.

A declaration from a defense investigator was attached to the new trial motion. The investigator stated that he had contacted Maria, Jose, and Merilu before trial and that he had met with defendant on multiple occasions. After defendant's convictions, the investigator asked Maria if anyone else had been present during the incident. Maria initially responded no, but she later gave the name of a person who had been outside the house. When that person failed to provide pertinent information, the investigator again asked Maria if anyone else had witnessed the incident. At that point, Maria disclosed that Gutierrez had been there. The investigator then contacted Gutierrez, who related what he had heard during the incident.

Gutierrez also provided a declaration in support of the motion for a new trial. He asserted that he had been watching television in the living room with the volume low while Maria and defendant were "having a normal conversation in the kitchen," which was adjacent to the living room. He heard Maria's voice rise as she told defendant to stop drinking. She then yelled at defendant, who responded in a louder voice. Gutierrez then heard Maria call out for Jose, and he heard Jose enter the kitchen and tell defendant to release the knife. He "never heard any threats." Gutierrez asserted he was still present when the officers arrived and that he had helped them look for Maria's cell phone.

The prosecution filed an opposition to the new trial motion, asserting that defendant failed to show that he had used due diligence in finding the new evidence, that the new evidence was cumulative to evidence presented at trial, and that it was not reasonably probable that Gutierrez's testimony would have led to a different result if it had been introduced at trial.

27

At the hearing on defendant's motion for a new trial, the trial court found that because defendant and the other residents of his home would have known that Gutierrez was present during the incident, "it would have been very simple for the defense to have located [the witness] and found out what he had to say." Thus, the trial court found that the defense could have discovered the evidence with reasonable diligence, such that it did not qualify as newly discovered. The trial court also found that Gutierrez's testimony would have been cumulative to the testimony of Maria and Merilu, since both denied hearing defendant make a threat. The trial court found that if Gutierrez's testimony was presented at a retrial, it was not reasonably probable that there would be a different result, because the jury appeared to believe what the witnesses had told the officers on the night of the incident.

### 2.       Legal Principles

Section 1181 authorizes a defendant to move for a new trial based upon nine different grounds, including "[w]hen new evidence is discovered material to the defendant, and which he [or she] could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

" '[T]he trial court has broad discretion in ruling on a new trial motion . . . ,' and its 'ruling will be disturbed only for clear abuse of that discretion.' [Citation.] In addition, '[w]e accept the trial court's credibility determinations and findings on

28

questions of historical fact if supported by substantial evidence.' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.)

### 3. Analysis

Defendant contends that he could not, with reasonable diligence, have discovered that Gutierrez had witnessed the incident on March 31, 2012. He notes that Gutierrez was not mentioned in the police reports, that defendant was so drunk that he may not have known Gutierrez was in the house, and that none of the other witnesses ever mentioned that Gutierrez had been present.

Defendant also contends that Gutierrez's testimony would not have been cumulative to that of other witnesses. He points out that Merilu testified she could not hear what defendant and Maria were saying to one another, so she never testified defendant did not make the threat. He also points out that Maria had a motive to recant her initial statement about the threat, whereas Gutierrez had no similar motive.

Even assuming the evidence could not have been discovered earlier and that it was not cumulative to evidence presented at trial, the trial court did not abuse its discretion by finding that Gutierrez's testimony was not " ' "such as to render a different result probable on a retrial of the cause." ' " (*Delgado, supra,* 5 Cal.4th at p. 328.) As the trial court found, the jury appeared to have believed the statements each of the witnesses made on the night of the incident, rather than their trial testimony. The jury would likely have had similar doubts about the credibility of Gutierrez's post-trial statement, particularly since Gutierrez did not make any statement to the police on the night of the incident despite allegedly interacting with the police during their investigation.

Defendant asserts that it was reasonably probable that Gutierrez's testimony would have led to a different result because "the case was close." In support of this assertion, defendant notes that the jury acquitted him of counts 1 and 3 (assault with a deadly weapon and interference with a wireless communications device). We disagree that the acquittals demonstrate the overall case was close. Rather, our review of the record

29

indicates that the evidence supporting counts 1 and 3 was weaker than the evidence supporting count 2 (the threat). Regarding the assault, the evidence showed that defendant moved toward Maria with a knife, but the jury could have found that defendant never actually assaulted her. Regarding the charge of interference with a wireless communications device, the evidence showed that Maria's cell phone was not found on defendant's person at the time of his arrest, and the jury may have found that even if defendant took her cell phone, it was not to prevent her from using it "to summon assistance or notify law enforcement or any public safety agency of a crime" (§ 591.5). In contrast, the evidence of the threat was strong. Maria told the officers that defendant had threatened to kill her and take their son away. The threat was not equivocal. As explained above, it was not a close question as to whether she was in reasonable and sustained fear. It was also not a close question whether defendant intended the threat to be taken as a threat. (See *Toledo, supra,* 26 Cal.4th at pp. 227-228.)

We conclude the trial court did not abuse its discretion by denying defendant's motion for a new trial.

### E.  *Probation Conditions*

Defendant contends that several of the probation conditions must be modified or stricken because they are "so vague that they violate the due process clause of the Fourteenth Amendment." As reflected in the minute order of September 20, 2012, the challenged conditions provide as follows:

"Not use or possess alcohol, intoxicants, narcotics, or other controlled substances without the prescription of a physician; not traffic in, or associate with persons you know, or have reason to know, to use or traffic in, narcotics or other controlled substances."

"Not possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon."

"Not associate with any individuals you know, have reason to know, or are told by the Probation Officer to be gang members, drug users, or on any form of probation or parole supervision."

### 1.     General Legal Principles

"A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*); see also *People v. Leon* (2010) 181 Cal.App.4th 943, 948-949 (*Leon*).) In addition, "[a] probation condition 'must be sufficiently precise for the probationer to know what is required of him [or her], and for the court to determine whether the condition has been violated,' if it is to withstand a [constitutional] challenge on the ground of vagueness." (*Sheena K., supra,* at p. 890; *Leon, supra,* at p. 949.) "[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' [Citation.] The rule of fair warning consists of 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders' [citation], protections that are 'embodied in the due process clauses of the federal and California Constitutions. [Citations.]' [Citation.]" (*Sheena K., supra,* at p. 890.)

The forfeiture rule does not apply when a probation condition is challenged as unconstitutionally vague or overbroad on its face and the claim can be resolved on appeal as a pure question of law without reference to the sentencing record. (*Sheena K., supra,* 40 Cal.4th at pp. 887-889; *Leon, supra,* 181 Cal.App.4th at p. 949.)

### 2.     Possession of Alcohol and Narcotics

Defendant first challenges the probation condition requiring that he "[n]ot use or possess alcohol, intoxicants, narcotics, or other controlled substances without the prescription of a physician . . . ." He contends that the condition should include an explicit knowledge requirement.

31

Defendant relies mainly on *People v. Patel* (2011) 196 Cal.App.4th 956 (*Patel*). In *Patel,* a condition of probation prohibited the defendant "from drinking alcohol, possessing it, or being in any place where it is the chief item of sale." (*Id.* at p. 959.) As the condition did not "include a qualification that he must commit the proscribed conduct knowingly" (*ibid.*), the court modified it to read: " 'Defendant shall abstain from the consumption of any alcoholic beverage knowingly in any amount whatsoever, and shall not knowingly possess alcohol, nor be in places where he knows alcohol is the chief item of sale.' " (*Id.* at p. 961.)

The Attorney General "agrees" with defendant's claim that the probation condition here should be modified as in *Patel*. In determining whether this concession is appropriate, we acknowledge that a scienter element may be reasonably implicit in the probation condition, at least to the extent that defendant is prohibited from possessing narcotics. (See *People v. Coria* (1999) 21 Cal.4th 868, 878 [criminal statutes prohibiting possession, transportation, and sale of controlled substances have implied requirement that an accused must be "aware of the character of the controlled substance at issue"].) However, the probation condition also extends to the use and possession of alcohol and "intoxicants." Particularly because the term "intoxicants" is susceptible of different interpretations, we determine it is appropriate to add an express knowledge requirement, to eliminate any potential for vagueness or overbreadth in applying the condition. We will modify the condition to provide that defendant shall not knowingly use or possess alcohol, intoxicants, narcotics, or other controlled substances without the prescription of a physician.

### 3.     Association With Persons Who Use or Traffic in Narcotics

Defendant next challenges the probation condition requiring that he "not traffic in, or associate with persons you know, or have reason to know, to use or traffic in, narcotics or other controlled substances." He specifically challenges the "reason to know" aspect

of this condition, contending that requires him to engage in "guesswork" about whether someone is a user or trafficker of controlled substances.

Defendant relies primarily on this court's decision in *People v. Gabriel* (2010) 189 Cal.App.4th 1070 (*Gabriel*), in which the defendant challenged as vague a probation condition prohibiting association " 'with any individuals you know or *suspect* to be gang members, drugs users, or on any form of probation or parole supervision.' " (*Id.* at p. 1073, italics added.) This court modified the condition to delete the word "suspect," reasoning as follows: "To 'suspect' is 'to imagine (one) to be guilty or culpable on slight evidence or without proof' or 'to imagine to exist or be true, likely, or probable.' (Merriam–Webster's Collegiate Dict. (10th ed.1999) p. 1187 (*Webster's*).) To 'imagine' is 'to form a notion of without sufficient basis.' (*Webster's,* at p. 578.) Given this lack of specificity, the word 'suspect' fails to provide defendant with adequate notice of what is expected of him when he lacks actual knowledge that a person is a gang member, drug user, or on probation or parole. Moreover, inclusion of this word renders the condition insufficiently precise for a court to determine whether a violation has occurred." (*Gabriel, supra,* at p. 1073.)

In contrast to the term "suspect" (*Gabriel, supra,* 189 Cal.App.4th at p. 1073), the phrase "reason to know" imposes an objective standard and requires a minimal level of objective justification. Because the phrase "reason to know" is included in the probation condition at issue, defendant must not associate with any individual who he has a rational ground to know has a certain status—i.e., that of being a user or transporter of controlled substances.

A similar phrase—"reasonably should know"—was ordered included in a probation condition in *People v. Turner* (2007) 155 Cal.App.4th 1432 (*Turner*). The original probation condition ordered that the defendant " '[n]ot associate with persons under the age of 18 unless accompanied by an unrelated responsible adult.' " (*Id.* at p. 1435.) The *Turner* court held that as phrased, the condition did "not pass

33

constitutional muster under the vagueness doctrine." (*Ibid.*) The court explained, "A person may reasonably not know whether he or she is associating with someone under the age of 18. Fair notice, as described in *Sheena K.,* is not possible unless the probation condition is modified to require that defendant must either know *or reasonably should know* that persons are under 18 before he is prohibited from associating with them." (*Id.* at p. 1436, italics added.)

In the context of penal statutes, courts have determined that culpability based on a constructive knowledge standard is not vague. For instance, in *In re Jorge M.* (2000) 23 Cal.4th 866, the California Supreme Court determined that proving a violation of the Assault Weapons Control Act (AWCA) required a showing "that a defendant charged with possessing an unregistered assault weapon *knew or reasonably should have known* the characteristics of the weapon bringing it within the registration requirements of the AWCA." (*Id.* at pp. 869-870.) Courts have likewise upheld the constitutionality of penal statutes that refer to a person who the defendant reasonably should know to be a peace officer. (See *People v. Rodriguez* (1986) 42 Cal.3d 730, 779-782 [finding constitutional special circumstance of peace officer murder under section 190.2, subdivision (a)(7), which applies to a defendant who has intentionally killed someone who the defendant "reasonably should have known" was a peace officer engaged in the performance of official duty]; *People v. Mathews* (1994) 25 Cal.App.4th 89, 97-98 [finding constitutional former section 417, subdivision (b), which prohibited a defendant from exhibiting a firearm in the presence of another when the defendant "reasonably should know" the person is a peace officer engaged in the performance of official duty].)

We conclude that the probation condition here is not rendered unconstitutionally vague by the fact it contains an element of constructive knowledge. A probation condition, like a penal statute, gives rise to criminal culpability for its violation. A probation condition that prohibits association with persons the defendant knows are within a certain class, therefore, may also prohibit association with persons the defendant

34

reasonably should know are within that class. Although it may not be immediately obvious based on appearance whether someone is a user or trafficker of controlled substances, the constructive knowledge standard will prevent defendant from being penalized for violating the court's order when he did not know, and could not reasonably have known, that a person was a user or trafficker of controlled substances.

Accordingly, we determine that the probation condition prohibiting defendant from associating with individuals who he knows or has "reason to know" to be a user or trafficker of controlled substances is not unconstitutionally vague.

### 4. Possession and Transportation of Weapons

Defendant contends we must add an explicit knowledge requirement to the probation condition requiring that he "[n]ot possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon." The Attorney General "agrees that the probation condition should be modified to require that he 'knowingly' violate it."

This court addressed a somewhat similar probation condition in *People v. Kim* (2011) 193 Cal.App.4th 836 (*Kim*). In *Kim,* the probation condition provided, " 'You shall not own, possess, have within your custody or control any firearm or ammunition for the rest of your life under Section[s] 12021 and 12316[, subdivision] (b)(1) of the Penal Code.' " (*Id.* at p. 840.) This court declined to modify the condition, explaining that "where a probation condition implements statutory provisions that apply to the probationer independent of the condition and does not infringe on a constitutional right, it is not necessary to include in the condition an express scienter requirement that is necessarily implied in the statute." (*Id.* at p. 843.) Thus, because the condition "explicitly reference[d] sections 12021 and 12316" and because knowledge was required under those statutes, the probation condition did not need not be modified to add an explicit knowledge requirement. (*Id.* at p. 846; compare *People v. Freitas* (2009) 179 Cal.App.4th 747, 750-753 [probation condition requiring that the defendant not

" 'own, possess or have custody or control of any firearms or ammunition' " modified to include knowledge element].)

With regard to the probation condition in this case, the rationale of *Kim* is not entirely applicable. The probation condition here does not track the statutory provision in former sections 12021 and 12316, nor does it contain a reference to any applicable statute. Moreover, defendant was not only prohibited from possessing and transporting firearms, but also "any deadly or dangerous weapons."

In *People v. Moore* (2012) 211 Cal.App.4th 1179 (*Moore*), the court also considered a probation condition that prohibited possession of " 'dangerous or deadly weapon[s],' " finding that the condition did not need to include an express scienter requirement because "the term 'dangerous or deadly weapon' . . . has a clearly established meaning." (*Id.* at p. 1186.) Specifically, as phrased, the probation condition "prohibited possession of items specifically designed as weapons, and other items not specifically designed as weapons that the probationer intended to use to inflict, or threaten to inflict, great bodily injury or death." (*Ibid.,* citing *In re R.P.* (2009) 176 Cal.App.4th 562, 565.) Considering that "the phrase had a plain, commonsense meaning," the *Moore* court concluded that the probation condition prohibiting weapons possession was "sufficiently precise to inform Moore of what is required of him, and for a court to determine whether the condition has been violated." (*Moore, supra,* at p. 1186.)

In this case, we do not reach the issue addressed in *Moore.* Here, the Attorney General agrees that the firearms/weapons condition should be modified to include the term knowingly. Moreover, we are modifying other probation conditions. Although the term knowingly may not be necessary, its inclusion will nevertheless help ensure defendant is not penalized if he unknowingly possesses a prohibited item. Thus, we will modify the condition to provide that defendant not *knowingly* possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon.

36

### 5. Association With Gang Members

Finally, defendant challenges the probation condition prohibiting him from associating with "individuals you know, have reason to know, or are told by the Probation Officer to be gang members . . . ." Defendant points out there was no evidence that his offenses were gang related or that he was ever a gang member. Defendant compares this case to *People v. Brandão* (2012) 210 Cal.App.4th 568, where this court struck a probation condition that prohibited the defendant from associating "with any individuals you know or are told by the Probation Officer to be gang members." (*Id*. at p. 571.) There, as in this case, "the record divulge[d] (1) no ties between defendant and any criminal street gang, (2) no such ties involving any member of defendant's family, and (3) no criminal history showing or strongly suggesting a gang tie." (*Id.* at p. 576.)

Defendant did not object to this condition below, and his challenge is fact-specific. However, the Attorney General concedes that imposition of this condition was error, and we find the concession appropriate. Therefore, we will modify the challenged probation condition to strike the words "gang members."

## IV. DISPOSITION

The probation condition that reads "Not use or possess alcohol, intoxicants, narcotics, or other controlled substances without the prescription of a physician; not traffic in, or associate with persons you know, or have reason to know, to use or traffic in, narcotics or other controlled substances" is modified to read "Not knowingly use or possess alcohol, intoxicants, narcotics, or other controlled substances without the prescription of a physician; not traffic in, or associate with persons you know, or have reason to know, to use or traffic in, narcotics or other controlled substances."

The probation condition that reads "Not possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon" is modified to read "Not knowingly possess, receive or transport any firearm, ammunition or any deadly or dangerous weapon."

The probation condition that reads "Not associate with any individuals you know, have reason to know, or are told by the Probation Officer to be gang members, drug users, or on any form of probation or parole supervision" is modified to read "Not associate with any individuals you know, have reason to know, or are told by the Probation Officer to be drug users or on any form of probation or parole supervision."

With these modifications, the judgment is affirmed.


_____
BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____
MÁRQUEZ, J.


_____
GROVER, J.